**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mary Ellen Heisser, | No. CV-15-00136-PHX-NVW |
| Plaintiff, | **ORDER** |
| v. | |
| Carolyn W. Colvin, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Mary Ellen Heisser seeks review under 42 U.S.C. § 405(g) of the final decision of the Commissioner of Social Security ("the Commissioner"), which denied her disability insurance benefits under sections 216(i) and 223(d) of the Social Security Act. Because the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence and is not based on legal error, the Commissioner's decision will be affirmed.

I.      **BACKGROUND**

Plaintiff was born in January 1955.  She graduated from Northern Arizona University with a bachelor's degree in 1977.  She worked for the Arizona Child Protective Service from September 1988 until May 2007, when she stopped working to care for her then-90 year old father.  On August 8, 2011, Plaintiff applied for disability insurance benefits, alleging disability beginning January 1, 2010.  On the application Plaintiff also indicated that although she stopped working for other reasons, she believed

that as of January 1, 2008, her conditions became severe enough to keep her from working. She alleged numerous impairments, including back injury, left ankle and foot injuries, fibromyalgia, diabetes, obstructive sleep apnea, two episodes of renal failure, ulcerative colitis, and chronic low iron. At the time of her application, Plaintiff reported her height as 5'6" and weight as 210 pounds.

On October 7, 2011, Plaintiff reported that she was able to prepare meals, do laundry, care for her 94-year-old father, care for her dog and birds, drive, use a computer, crochet, do needlework, watch television, and shop for food, clothes, and gifts. She reported having no problems with personal care. She also reported that she went to church at least once a week, played bingo once a week, and attended church meetings two to five times a month. She said that she fully participated in all activities. Plaintiff said that she did not sleep well because of obstructive sleep apnea and took naps almost every day. She also reported that she often woke up feeling stiff and sore because of her fibromyalgia, and two or three times a week she needed to take a pain pill as soon as she woke up. On other days, she usually took at least one pain pill later in the day. She reported having suffered multiple injuries and surgeries to her left ankle and foot, including breaking the fifth metatarsal on her left foot three times in 2009. She also reported she had lumbar spondylosis causing difficulty walking, back pain that prevented sitting more than 30 minutes, and constant pain in her left hip and thigh area, which affected sitting, standing, walking, and laying down. Plaintiff said she drove 250 miles for a day trip to the mountains, and the next day her back hurt so much she could barely move. She said she had trouble lifting anything weighing more than about a pound. When she shopped at several stores in a mall, she had to stop several times to rest; if she had several packages, she took them to her car before finishing shopping because she could not carry much.

From April 2009 through January 2012, Plaintiff received physical therapy for lower back, hip, ankle, and/or foot pain. She usually reported chronic pain, but the severity varied. In November 2011, Plaintiff reported foot, back, and fibromyalgia pain,

but said that the day before she had gone to the grocery store and then stood in the kitchen for three hours baking.   In January 2012, Plaintiff reported her back began hurting more after going to a movie and that she used to work out at the gym three or four days a week, but had not gone in several months.

In January 2012, Plaintiff told the State agency psychological examiner that she enjoyed reading three or four books a month, doing needlework, and playing bingo.  She went out to dinner one to three times a week and took her father out to breakfast on Sundays after church.  She attended physical therapy three times a week.  She had just completed a seven-week dog training course and enjoyed taking her dog on walks several times a week.  She played with her birds and cleaned the bird cage weekly.  She played computer games frequently and took her father to the movies one to three times a month. She went to church meetings two or three evenings a month.  Plaintiff reported that her memory and concentration were good, and she denied having comprehension problems. The psychologist noted she had good recall of dates and events, and questions did not need to be repeated or explained.  The psychologist did not observe any pain behavior or difficulty moving from sitting to standing and vice versa.

On April 8, 2013, Plaintiff appeared with her attorney and testified at a hearing before the ALJ.  A vocational expert also testified.  Plaintiff's attorney told the ALJ that the primary reason for Plaintiff's disability claim "is the chronic problem she's had with her left ankle/left foot."   Plaintiff's attorney also told the ALJ that Plaintiff's alleged disability onset date should be January 1, 2008, because she reported that as the date on which her medical conditions became severe enough to keep her from working.  The ALJ stated that Plaintiff's application said January 1, 2010, and asked whether Plaintiff wanted to amend the alleged onset date to January 1, 2008.   Plaintiff's counsel responded, "Correct," and said he had explained to Plaintiff that it would not affect any

1  back benefits because she did not apply until 2011, but "it would potentially fill in a

2  couple of extra years of . . . zero earnings."[1]

3       During the hearing before the ALJ, Plaintiff testified that she quit working to care

4  for her father in July 2007, and in November 2007 she initially hurt her ankle.  Until

5  September 2012, when her father began to receive assistance from care givers, Plaintiff

6  regularly prepared all of her father's meals and did his laundry and grocery shopping, but

7  he was able to bathe and dress himself.  She said she used a scooter at the grocery store

8  after her surgeries and "a few other times."  Plaintiff testified that she was in charge of

9  funeral brunches for her parish, so she set things up, served food, and cleaned up at "a

10 dozen plus" funeral brunches in the two years before the April 2013 hearing.  Sometimes

11 she was responsible for putting together meat and cheese trays, which involved shopping,

12 putting the food on trays, and making sure the rolls were cut and put on serving trays.

13 She also helped serve food at the women's group meetings two or three times a year.

14 When Plaintiff's attorney asked her why she was not able to work full-time if she was

15 able to do these things, she responded, "I have a very high tolerance for pain, and I have

16 had a lot of pain through my life, and I try not to whine about it, and I work through it."

17 Plaintiff said that after a big funeral brunch, she may not be able to move for a couple

18 days.  Plaintiff also testified that she played bingo weekly for about four to four and a

19 half hours with a ten-minute intermission.

20      On May 7, 2013, the ALJ issued a decision that Plaintiff was not disabled within

21 the meaning of the Social Security Act.  The Appeals Council denied Plaintiff's request

22 for review of the hearing decision, making the ALJ's decision the Commissioner's final

23 decision.  On January 26, 2015, Plaintiff sought review by this Court.

---

24     [1] Plaintiff's Opening Brief includes benefit calculations based on her earnings

25 history for 2002-2006, the five years before the January 1, 2008 date of alleged onset of
   disability.  During 2002-2006, Plaintiff earned an average of $39,022.68 per year.  If

26 Plaintiff's alleged disability onset date was January 1, 2010, her five-year earnings

27 history would include 2007, during which she earned $15,106.86, and 2008, during
   which she earned $0.00.

28

1   **II.    STANDARD OF REVIEW**

2          The district court reviews only those issues raised by the party challenging the

3   ALJ's decision.  *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001).  The court

4   may set aside the Commissioner's disability determination only if the determination is

5   not supported by substantial evidence or is based on legal error.  *Orn v. Astrue*, 495 F.3d

6   625, 630 (9th Cir. 2007).   Substantial evidence is more than a scintilla, less than a

7   preponderance, and relevant evidence that a reasonable person might accept as adequate

8   to support a conclusion considering the record as a whole.  *Id.*  As a general rule,

9   "[w]here the evidence is susceptible to more than one rational interpretation, one of

10  which supports the ALJ's decision, the ALJ's conclusion must be upheld."  *Thomas v.*

11  *Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted); *accord Molina v. Astrue*,

12  674 F.3d 1104, 1111 (9th Cir. 2012) ("Even when the evidence is susceptible to more

13  than one rational interpretation, we must uphold the ALJ's findings if they are supported

14  by inferences reasonably drawn from the record.").  "Overall, the standard of review is

15  highly deferential."  *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1002 (9th Cir.

16  2015).

17  **III.   FIVE-STEP SEQUENTIAL EVALUATION PROCESS**

18         To determine whether a claimant is disabled for purposes of the Social Security

19  Act, the ALJ follows a five-step process.  20 C.F.R. § 404.1520(a).  The claimant bears

20  the burden of proof on the first four steps, but the burden shifts to the Commissioner at

21  step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

22         At the first step, the ALJ determines whether the claimant is engaging in

23  substantial gainful activity.   20 C.F.R. § 404.1520(a)(4)(i).   If so, the claimant is not

24  disabled and the inquiry ends.  *Id.*  At step two, the ALJ determines whether the claimant

25  has a severe medically determinable physical or mental impairment.  § 404.1520(a)(4)(ii).

26  If not, the claimant is not disabled and the inquiry ends.  *Id.*  At step three, the ALJ

27  considers whether the claimant's impairment or combination of impairments meets or

28  medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Pt. 404.  §

- 5 -

404.1520(a)(4)(iii).  If so, the claimant is automatically found to be disabled.  *Id.*  If not, the ALJ proceeds to step four.  At step four, the ALJ assesses the claimant's residual functional capacity and determines whether the claimant is still capable of performing past relevant work.  § 404.1520(a)(4)(iv).  If so, the claimant is not disabled and the inquiry ends.  *Id.*  If not, the ALJ proceeds to the fifth and final step, where he determines whether the claimant can perform any other work based on the claimant's residual functional capacity, age, education, and work experience.  § 404.1520(a)(4)(v).  If so, the claimant is not disabled.  *Id.*  If not, the claimant is disabled.  *Id.*

At step one, the ALJ found that Plaintiff last met the insured status requirements of the Social Security Act through December 31, 2012, and that she did not engage in substantial gainful activity from January 1, 2010, through December 31, 2012.  At step two, the ALJ found that Plaintiff has the following severe impairments:  fibromyalgia, lumbar degenerative disc disease, history of left ankle fixation surgery, history of right foot fixation, hip bursitis, and obesity.  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

At step four, the ALJ found that, through the date last insured, Plaintiff:

> had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant is able to operate foot controls occasionally with her left lower extremity, but never with her right lower extremity.  The claimant is also able to frequently balance and stoop, as well as occasionally crouch, kneel, crawl, and climb ramps and stairs.  The claimant should never be required to climb ladders, ropes o[r] scaffolds.  The claimant [sh]ould also avoid concentrated exposure to nonweather related extremes in temperatures, humid work places, dangerous with moving mechanical parts except motor vehicles, and unprotected that are high, exposed.

The ALJ further found that, through the date last insured, Plaintiff was capable of performing past relevant work as a "Child Support Program Director" and "Telephone Interceptor."

1

2

**IV.    ANALYSIS**

    **A.    Harmless Error**

3

4

5

6

7

      Harmless error principles apply in the Social Security Act context. *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). An error is harmless if there remains substantial evidence supporting the ALJ's decision and the error does not affect the ultimate nondisability determination. *Id.* The claimant usually bears the burden of showing that an error is harmful. *Id.* at 1111.

8

9

10

11

12

13

14

15

16

17

18

      The ALJ's hearing decision states that during the hearing Plaintiff chose to amend the alleged onset day of disability to January 1, 2008, and that her attorney said she was aware that the amendment would have no effect on her Title II back benefit. The decision states, "[T]he following discussion will assume the claimant's amended onset date of January 1, 2008." The ALJ's decision also states, "The claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 1, 2010 through her date last insured of December 31, 2012." Plaintiff has not shown that this single reference to the incorrect alleged onset date had any effect on the ultimate nondisability determination. As Plaintiff's attorney explained during the hearing, the purpose of amending the alleged onset date was to increase the earnings history used to calculate disability benefits.

19

20

21

22

23

24

      The ALJ's hearing decision also refers to the fracture of Plaintiff's "left 5th *toe*" instead of the fracture of Plaintiff's left fifth *metatarsal*. Plaintiff contends this shows the ALJ's fundamental misunderstanding of Plaintiff's medical conditions and records. Plaintiff has not shown that this incorrect reference—even if the ALJ actually confused a metatarsal fracture with a toe fracture—had any effect on the ultimate nondisability determination.

25

      Therefore, both incorrect references are found to be harmless error.

26

27

28

1

2

### B.   The ALJ Provided Clear and Convincing Reasons for Discrediting Plaintiff's Symptom Testimony.

3

4

5

6

7

If a claimant's statements about pain or other symptoms are not substantiated by objective medical evidence, the ALJ must consider all of the evidence in the case record, including any statement by the claimant and other persons, concerning the claimant's symptoms.   SSR 96-7p.   Then the ALJ must make a finding on the credibility of the claimant's statements about symptoms and their functional effects.   *Id.*

8

9

10

11

12

13

14

15

16

17

In evaluating the credibility of a claimant's testimony regarding subjective pain or other symptoms, the ALJ is required to engage in a two-step analysis:   (1) determine whether the claimant presented objective medical evidence of an impairment that could reasonably be expected to produce some degree of the pain or other symptoms alleged; and, if so with no evidence of malingering, (2) reject the claimant's testimony about the severity of the symptoms only by giving specific, clear, and convincing reasons for the rejection.   *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).   "This is not an easy requirement to meet:   'The clear and convincing standard is the most demanding required in Social Security cases.'"   *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

18

19

20

21

22

23

24

To ensure meaningful review, the ALJ must specifically identify the testimony from a claimant the ALJ finds not to be credible and explain what evidence undermines the testimony.   *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014).   "General findings are insufficient."   *Id.*   The ALJ must make findings "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."   *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002); *accord Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008).

25

26

27

28

In making a credibility determination, an ALJ "may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the claimant's allegations."   *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009) (internal quotation marks and citation omitted).   But "an ALJ

may weigh inconsistencies between the claimant's testimony and his or her conduct, daily activities, and work record, among other factors." *Id.* Further, the claimant is not required to produce objective medical evidence of the symptom or its severity. *Garrison*, 759 F.3d at 1014. The ALJ must consider all of the evidence presented, including the claimant's daily activities; the location, duration, frequency, and intensity of the pain or other symptoms; factors that precipitate and aggravate the symptoms; effectiveness and side effects of any medication taken to alleviate pain or other symptoms; treatment other than medication; any measures other than treatment the claimant uses to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p.

First, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." Second, the ALJ found Plaintiff's "statements regarding the intensity, persistence, and limiting effects of these symptoms not entirely credible for the reasons explained in this decision."

The ALJ found that Plaintiff's claim that she is unable to perform her past work or any other work because of her severe symptoms is not substantiated by objective medical evidence and is inconsistent with her conduct, daily activities, and conservative treatment. Plaintiff's symptoms are fatigue and lower back, hip, ankle, and/or foot pain. The ALJ made findings about the severity of each of these. Regarding Plaintiff's hip, the ALJ noted that an MRI of her hip revealed only mild findings, and subsequent x-rays showed even less degeneration. Regarding her lumbar back, the ALJ noted MRI and x-ray evidence revealed only mild and stable degenerative disc disease. The ALJ further noted that examination at the Arizona Center for Neurosurgery showed normal range of motion and motor strength and that aerobic exercise and stretching exercises were recommended. Regarding Plaintiff's foot and ankle problems, the ALJ noted that Plaintiff had sought only conservative treatment. Regarding fibromyalgia, the ALJ noted that Plaintiff reported at the hearing she had been dealing with this condition for more than 20 years, but had not seen her rheumatologist for more than a year. The ALJ also

stated that Plaintiff had not reported or sought treatment for fibromyalgia-related symptoms of cognitive or memory problems, depression, anxiety, or irritable bowel syndrome.  The ALJ further observed that Plaintiff had been repeatedly advised to exercise to improve her condition, but she had not followed the advice.

The ALJ stated that although Plaintiff had been noted to use an assistive device, a treating orthopedist observed that she ambulates without a limp without any assistive devices, "suggesting her impairment is not as severe as she alleges, but also was exaggeration."  The ALJ stated that Plaintiff said she left work in order to take care of her father, not due to a medically determinable impairment.  The ALJ further stated:

> The claimant also provided that she is able to recreationally read, utilize a computer, sit for an hour before needing to get up, and complete light household chores including her own laundry, straighten her kitchen, sweep the floor, as well as shop independently, drive a vehicle, attend church twice per week, play bingo at gambling halls for 4-4½ hours, and engage in community service activities serving food and planning funeral brunches for patrons. . . .  The undersigned did note also that the claimant reported while playing bingo, she can sit for 2 hours, but then will need to get up for 10 minutes to relieve her back pain.  []  Not only is this inconsistent with the claimant's testimony provided just 10 minutes earlier, but this is sufficient sitting and concentration capacity to support substantial gainful activity.

The ALJ also "noted that in addition to the claimant's handwritten notes, the claimant was able to produce a rather lengthy statement regarding her limitations, suggesting an ability to engage and maintain activities and projects."

Plaintiff contends that the ALJ's credibility determination is based on misunderstanding her medical records, such as referring to "toe" instead of "metatarsal" and saying "no evidence has been offered to show that any trigger point analysis has ever been completed to support a formal diagnosis of fibromyalgia."  Plaintiff contends the ALJ was incorrect because her rheumatologist's treatment notes include multiple notations of "T" referring to "tenderness" at certain locations.  However, the notes do not show that the rheumatologist tested 18 points and found tenderness at least 11 of them.

Moreover, Plaintiff did not provide a medical source statement from her rheumatologist, Plaintiff did not testify that fibromyalgia prevented her from performing her past work, and Plaintiff's attorney told the ALJ the primary reason for her disability claim is her chronic problem with her left ankle and foot.

The ALJ provided specific, clear, and convincing reasons for rejecting Plaintiff's testimony about the severity of her symptoms.  Plaintiff testified that she could not perform her past work because she cannot sit for more than 30 minutes because of back and hip pain.  She also testified that she plays bingo weekly for about four to four and a half hours with a ten-minute intermission.  She testified that she is capable of performing a wide range of activities because she has learned to work through the pain.  The ALJ did not err in finding Plaintiff's testimony about her functional limitations not fully credible.

### C.     Past Relevant Work

At step four, the claimant has the burden of showing she can no longer perform her past relevant work.  *Pinto v. Massanari*, 249 F.3d 840, 844 (9th Cir. 2001).  The ALJ may conclude the claimant can perform past relevant work by finding she is able to perform the actual functional demands and duties of a particular past relevant job *or* she is able to perform the functional demands and duties of the occupation as generally required by employers throughout the national economy.  *Id.* at 845.  Thus, at step four, the claimant has the burden to prove she cannot perform her prior relevant work either as actually performed or as generally performed in the national economy.  *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1166 (9th Cir. 2008).  Although the burden of proof rests with the claimant at step four, the ALJ must make specific factual findings regarding the claimant's residual functional capacity, the physical and mental demands of the past relevant work, and the relation of the residual functional capacity to the past work.  *Pinto*, 249 F.3d at 845.

The ALJ may assess a claimant's past relevant work as actually performed by considering a properly completed vocational expert's report and/or the claimant's own testimony.  *Id.*  The *Dictionary of Occupational Titles* usually is the best source for how a

job is generally performed.  *Pinto*, 249 F.3d at 845.  Here, however, Plaintiff provided testimony and extensive written descriptions of her prior relevant work as actually performed.

In her Work History Report Plaintiff reported that from December 1988 to April 2006 she worked for the Arizona Child Protective Service as a CPS Specialist III and from April 2006 through May 2007 as a CPS Program Specialist.  She said that as a CPS Program Specialist, she was at the same level as a CPS Unit Supervisor, was in charge of Team Decision Making meetings, and looked to for guidance in areas of policy and procedure by CPS Specialists and Supervisors.  She reported that she spent six hours or more a day sitting, two hours or more standing, and half an hour walking.  She occasionally needed to drive to other offices.  She said the heaviest weight she lifted was ten pounds, which involved lifting and carrying her laptop computer approximately 50 feet.

In a lengthy attachment to her Work History Report, Plaintiff described five jobs that she performed from December 1988 to April 2006, not just the CPS Specialist III position as she indicated in the report.  She said she worked at the Child Abuse Hotline from November 1994 to April 2006.  Plaintiff reported, "The job consisted of sitting at a desk probably 99% of the time, using the computer and telephone.  No real lifting or carrying was done."  "The other 1% was using the copy machine, walking from point to point in the office, etc."  During the hearing, Plaintiff testified she "worked at the Child Abuse Hotline, and that was all sitting, all in the office."  She testified that she would not be able to do that job because she could not sit that long with her back and hip pain.

The vocational expert categorized Plaintiff's prior work as a Child Support Program Director, which is highly skilled sedentary work, and as a Telephone Interceptor Operator, which is semiskilled sedentary work.  She said that Telephone Interceptor Operator was the closest job description she could find to Plaintiff's work at the Child Abuse Hotline.  The ALJ asked the vocational expert whether a hypothetical individual with Plaintiff's residual functional capacity, *i.e.*, light work with certain postural and

1    environmental limitations, would be capable of performing either job. The vocational
2    expert said such a hypothetical individual should be able to perform both of the
3    occupations. Although the vocational expert described both occupations as sedentary,
4    she further testified that if driving was required, an otherwise sedentary job would be
5    considered light work.

6            Plaintiff contends that the ALJ's determination that Plaintiff was capable of
7    performing past relevant work is not supported by substantial evidence because the ALJ
8    did not ask a hypothetical question that involved sedentary work and the vocational
9    expert incorrectly described Plaintiff's past work as including "CPS unit supervisor" in
10   addition to CPS program specialist and specialist III. Plaintiff incorrectly asserts that the
11   vocational expert conceded she could not match either of Plaintiff's past jobs with the
12   *Dictionary of Occupational Titles*. In fact, the vocational expert said only that she could
13   not find an exact match for the Child Abuse Hotline position and that the job Plaintiff
14   performed probably had a higher skill level than Telephone Interceptor Operator. Skill
15   level is irrelevant here because Plaintiff has no mental impairments.

16           There is no error here. The ALJ's hypothetical involved an individual who could
17   perform light work, the vocational expert said the Child Support Program Director
18   occupation was light work if it required driving, Plaintiff's work at the Child Abuse
19   Hotline was sedentary, and the vocational expert testified that an individual who could
20   perform light work could perform either job. If someone can do light work, the
21   individual can perform sedentary work unless there are additional limiting factors, such
22   as inability to sit for long periods of time. 20 C.F.R. § 404.1567(b). No medical source
23   opined that Plaintiff is unable to sit for long periods of time, and Plaintiff testified she can
24   sit for four hours or more with only a ten-minute break. Therefore, it was not necessary
25   for the ALJ to ask the vocational expert whether someone with Plaintiff's residual
26   functional capacity could perform sedentary work.

27           Moreover, the ALJ may assess a claimant's past relevant work as actually
28   performed by considering the claimant's own testimony. *Pinto*, 249 F.3d at 845.

Plaintiff provided a great deal of information about how she actually performed her past work.  She testified she could not perform the Child Abuse Hotline job because she would need to stand more frequently than during normal breaks.  She testified that as a CPS Program Specialist she would be able to get up and walk around the room, but it would have been difficult during some meetings.  Because the ALJ found her claim of inability to sit for more than 30 minutes as lacking credibility, the ALJ did not err by finding her capable of performing past relevant work.

IT IS THEREFORE ORDERED that the final decision of the Commissioner of Social Security is affirmed.  The Clerk shall enter judgment accordingly and shall terminate this case

Dated this 21st day of April, 2016.

_____
Neil V. Wake
United States District Judge

- 14 -